# United States District Court

_____ DISTRICT OF __THE NORTHERN MARIANA ISLANDS__

In the Matter of the Search of
The property, also known as "Huang Zheng Corporation, Ltd.," a compound located in Puerto Rico village, Saipan, CNMI, on the north-east corner of Chalan Pale Arnold Road and Puerto Rico Drive, the entrance to which is located on the north side of Puerto Rico Drive and approximately 200 feet east of Chalan Pale Arnold Road; and the property located on the east side of Chalan Pale Arnold Road approximately 720 feet south of the south-west-most corner of the above-described "Huang Zheng Corporation, Ltd." property, approximately 100 feet north of the intersection of Chalan Pale Arnold Road and Puetto Street.

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**
CASE NUMBER: **MC 07 - 00065**

I __JOSEPH E. AUTHER_____ being duly sworn depose and say:

I am a __Special Agent of the Federal Bureau of Investigation__ and have reason to believe
Official Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

The property, also known as "Huang Zheng Corporation, Ltd.," a compound located in Puerto Rico village, Saipan, CNMI, on the north-east corner of Chalan Pale Arnold Road and Puerto Rico Drive, the entrance to which is located on the north side of Puerto Rico Drive and approximately 200 feet east of Chalan Pale Arnold Road; and the property located on the east side of Chalan Pale Arnold Road approximately 720 feet south of the south-west-most corner of the above-described "Huang Zheng Corporation, Ltd." property, approximately 100 feet north of the intersection of Chalan Pale Arnold Road and Puetto Street, as described in Attachment A and incorporated herein by reference.

on the island of Saipan in the District of _____the Northern Mariana Islands_____ there is now concealed a certain person or property, namely

the items described in Attachment B and incorporated herein by reference,

which is evidence, fruits and instrumentalities of crimes against the United States concerning a violation of Title __18__ United States Code, Section __641__.

The facts to support a finding of Probable Cause are as follows:

See Attachment C, Affidavit of FBI Special Agent Joseph E. Auther, incorporated herein by reference.

Continued on the attached sheets and made a part hereof.   ☒ Yes  ☐ No

FILED
Clerk
District Court

DEC 21 2007

For The Northern Mariana Islands
By_____
(Deputy Clerk)

Signature of Affiant
Joseph E. Auther
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence

December 21, 2007     5:10 pm     at     Saipan, Commonwealth of the Northern Mariana Islands
Date                                                    City and State

HONORABLE ALEX R. MUNSON
Chief United States District Court Judge
Name and Title of Judicial Officer

Signature of Judicial Officer

Attachment A

Description of Premises to be Searched

1.) The property, also known as "Huang Zheng Corporation, Ltd.," a compound located in the village of Puerto Rico on the island of Saipan, in the Commonwealth of the Northern Mariana Islands, on the north-east corner of Chalan Pale Arnold Road and Puerto Rico Drive, the entrance to which is located on the north side of Puerto Rico Drive and approximately two hundred (200) feet east of Chalan Pale Arnold Road, and which includes two (2) warehouses, a partially-enclosed concrete-block building, a concrete-block building with a red-tiled roof, and open area encircled by a concrete wall; and

2.) The property (see aerial photograph attached hereto as Exhibit 1(A) and photograph attached hereto as Exhibit 1(B)) photograph attalocated (a) on the east side of Chalan Pale Arnold Road approximately seven hundred twenty (720) feet south of the south-west-most corner of the above-described "Huang Zheng Corporation, Ltd." property, (b) approximately 100 feet north of the intersection of Chalan Pale Arnold Road and Puetto Street, and (c) located in the center of a block building and to the north of, and contiguous to, a part of the same block building that bears a row of "Marlboro" logos, and to the north of, and contiguous to, part of the same block building that bears painting that reads "Yu Bo Corp";

Attached and incorporated by reference is Exhibit 1-A, an aerial photograph of the property above-described in paragraph 1.). Also attached and incorporated by reference is Exhibit 1-B, a photograph of the property above-described in paragraph 2.).

Attachment B

Description of Items to be Seized

1.) Stolen property of the United States, including metal, brass-colored light fixtures and component parts of those fixtures;

2.) Records of transactions and activities relating to the theft of government property or other violation of 18 United States Code Section 641, including but not limited to video recordings and documentary records, ledgers, invoices, reports, customer lists, books, notes, diaries and any records reflecting the names, addresses, telephone numbers and other contact and identification data;

3.) Currency, financial statements, bank or credit union account records, bank, credit union or credit card receipts, and other evidence of financial transactions relating to obtaining, transferring, secreting or spending various sums of money made from engaging in theft of government property or other violations of 18 United States Code 641;

4.) Items of business or personal property which tend to identify the person(s) in occupancy or control of the premises that are the subject of this warrant, including but not limited to receipts, invoices, telephone bills, statements or similar documents, identification documents and room keys, storage facility rental agreements and records of mail services;

5.) Bills of lading, customs and shipping documentation, and other records related to the transportation or shipping of stolen government property or other items related to violations of United States Code Section 641;

6.) Photographs, long distance or other telephone toll records, cellular telephones, electronic pagers/beepers, personal phone books or other records tending to depict or identify potential witnesses to and co-conspirators in the theft of government property or other violation of 18 United States Code Section 641;

7.) Computers and computer-stored information, including but not limited to video recordings, relating to theft of government property or other violation of 18 United States Code Section 641, and such records retained or maintained on any type of telephone, telephone answering machines, "Blackberry"-type communication devices, or information maintained on any other electronic device that is capable of record storage.

## ATTACHMENT C

### AFFIDAVIT

I, Joseph E. Auther, being duly sworn and under oath, hereby state as follows:

1.) I have been a Special Agent of the Federal Bureau of Investigation for 17 years. For the last five years I have been assigned to the Honolulu Division, Saipan Resident Agency, District of the Northern Mariana Islands. I make this Affidavit pursuant to Rule 41 of the Federal Rules of Criminal Procedure for the issuance of a warrant to search the business of ***Huang Zheng Corporation, Ltd. and associated premises*** in the village of Puerto Rico, Saipan, Commonwealth of the Northern Mariana Islands, which is in the District of the Northern Mariana Islands. I have personally participated in this investigation and am familiar with the information contained in this Affidavit, through personal observations, discussions with other law enforcement officers or cooperating witnesses who have obtained information that has been reported to me, or my interview of witnesses.

2.) I make this affidavit in support of the Government's application for a warrant to search the premises described in Attachment A (attached hereto), on which I have reason to believe there is now concealed certain property that is set forth in Attachment B (attached hereto) and that constitutes evidence of violations of 18 United States Code Section 641, Theft of Government Property.

3.) Where conversations or statements of others are related in this Affidavit they are related in substance and in part. Because this Affidavit is made for the limited purpose of obtaining a search warrant, I have not set forth every fact that I have learned during the course of this investigation.

//

//

//

## PROBABLE CAUSE

4.) On several occasions within the month of December 2007, most recently on December 20, 2007, I spoke with Samuel Martinsen ("Martinsen"), who told me the following:

a.) He is employed by the United States Department of Interior, National Park Service, as a Law Enforcement Ranger. One of his duties is to patrol American Memorial Park ("AMP"), which is located in Garapan village, Saipan, Commonwealth of the Northern Mariana Islands ("CNMI").

b.) On November 5, 2007, while on patrol in the Smiling Cove area of AMP, he discovered and reported that the lights that illuminate the flags in the area of AMP known as the "Court of Honor" were not shining. On the morning of November 6, 2007, Benjamin Attao of the AMP Maintenance Division informed Martinsen that the lights at the Court of Honor appeared to have been vandalized and stolen. Approximately thirty-two (32) custom-made, metal, brass-colored light fixtures were missing, including approximately eleven (11) round spotlights and twenty-one (21) square floodlights.

c.) On November 6, 2007, at about 1000 hours AMP Chief Ranger Bryan Piercy ("Piercy") and Martinsen drove to three recycling centers on Saipan and informed these businesses of the theft. One of these centers was Huang Zheng Corporation, Ltd. ("Huang Zheng"). Piercy and Martinsen described the stolen light fixtures ("lights") to each center's employees, left their business cards and requested a phone call if the employees saw the lights.

d.) On November 6, 2007, at about 1300 hours a man who identified himself as an employee at Huang Zheng called to inform Martinsen that the lights that AMP was looking for were located at Huang Zheng. Additionally, the man said that Piercy and Martinsen could come to Huang Zheng in order to verify that the lights were the stolen ones.

e.) On November 6, 2007, at about 1330 hours Martinsen and Piercy arrived at Huang Zheng and met with a man who identified himself as Masirul Mollah ("Mollah"). Mollah claimed to be the man who had called AMP earlier that day. Mollah led them through two large, warehouse buildings on the premises of Huang Zheng and to an open area at Huang Zheng located behind one of these warehouse buildings. This open area is located to the north of and in back of the Huang Zheng receiving yard. Mollah indicated that the lights were not in the place where he had originally seen them, but he showed them his cell phone. His cell phone displayed digital pictures that Mollah claimed to have taken of the stolen lights. Martinsen recognized the lights shown in the pictures as some of the lights stolen from AMP.

f.) Once Mollah had shown them the pictures of the lights, a man later identified as Peter Che ("Che") arrived at the open area behind the Huang Zheng receiving yard. Che conducted himself as a manager of Huang Zheng and claimed to be in possession of light fixtures sold to Huang Zheng on November 1, 2007, and November 5, 2007. Che said that Martinsen and Piercy could have the lights back if they paid Che for them. Martinsen informed Che that the lights at issue were stolen Federal property, but Che refused to return the lights unless he first received payment. Che told Martinsen that the names of the sellers of the lights were in his office. Che then took Piercy and Martinsen to this office, which was located in a building that stands approximately seven hundred twenty (720) feet south of the south-west-most corner of Huang Zheng, as described in Attachment A. Once in this office, Che searched through some papers but said that he couldn't find the names. As they left the building, and out of Che's presence, Mollah told Martinsen and Piercy that he would meet them at AMP at 1800 hours to discuss the stolen lights.

g.) On November 6, 2007, at about 1800 hours Mollah arrived at AMP. He told

Piercy and Martinsen that the lights had actually been at Huang Zheng earlier that day. Mollah again showed them his cell-phone pictures of the lights. He instructed them to return to Huang Zheng the next morning at about 9:00 a.m., when he would give them pictures of and other information about the sellers of the lights. Mollah indicated that between ten (10) to fifteen (15) lights from AMP were at Huang Zheng.

  h.) On November 6, 2007, at about 2220 hours Martinsen received a call at his residence from security guard V.M. Binalay ("Binalay"), who patrols AMP at night. Binalay told Martinsen that more lights had just been stolen from an area at the entrance to the AMP Court of Honor. When Martinsen arrived at AMP at about 2240 hours, Binalay related that a male adult, about 5 feet four inches tall, reported the theft to Binalay. The unknown male told Binalay that as the male had been walking past the front entrance of AMP at the intersection of Beach and Micro-Beach roads, the male had witnessed two men breaking off and stealing lights from the entrance to the Court of Honor. Martinsen confirmed that twelve custom-made square, metal, brass-colored floodlights with shrouds were missing. However, one of the broken lights was subsequently located in AMP, leaving missing a total of forty-three (43) lights worth over fifteen thousand dollars ($15,000.00).

  i.) On November 7, 2007, at about 0900 hours Piercy and Martinsen arrived at Huang Zheng at Mollah's invitation. They were joined soon afterwards by CNMI Department of Public Safety Officer Sandy Hambros. Mollah arrived and instructed them to enter an area of Huang Zheng where the recycling center receives scrap metal from people who are trying to sell it. There were other, unidentified people present in this area. Mollah pointed out a white plastic, five-gallon container that held what Martinsen recognized to be multiple lights stolen from AMP. Mollah then pointed to a man who was standing behind Martinsen, whispering that this man had just brought in

these lights for sale.

j.) After Mollah pointed out the man who had brought in what appeared to be some of the stolen lights, Martinsen questioned the latter. The man was later identified as James Ochcha of Saipan. Ochcha admitted to Martinsen that he knew that the lights were stolen from AMP but claimed no knowledge of who had stolen the lights. He said that two men whom Ochcha had seen before had picked him up, beaten him and made him sell the lights. Ochcha claimed not to know the names of the men. However, once under arrest and after hearing his *Miranda* warnings, Ochcha provided the names of the two men: Dominic Chptwelong and Nesik Jordaness.

k.) As Martinsen dealt with Ochcha, Mollah pointed out to Martinsen a sedan that Mollah said was being used by the people selling the stolen lights. Martinsen saw this silver-gray sedan speed away from Huang Zheng and noticed that the sedan bore the tag number "ABO100." This tag number is registered in the CNMI to a Tomaso Chptwelong.

l.) On November 29, 2007, at about 0900 hours, Martinsen returned to Huang Zheng. While there, an employee, later identified as Xu Wang Meng ("Xu"), told Martinsen that the lights he sought were in the Huang Zheng warehouse. Later Martinsen was met by Quan Huang ("Huang"), who purported to be the owner of Huang Zheng. Huang, a Chinese speaker, had Che translate for him. Che related that Huang knew that the lights in question were stolen from AMP, but Huang clarified that he knew that from hearing Piercy and Martinsen explain that during one of their previous visits to Huang Zheng. When Martinsen asked Huang to show him the rest of the stolen lights, Huang asked how Martinsen knew that other stolen lights were at Huang Zheng. Specifically, Huang asked whether the "Bangladeshi" had told Martinsen that. Martinsen acknowledged only that a Chinese employee of Huang Zheng had told him that. Che told Martinsen that this Chinese employee, Xu, was Huang's brother-in-law.

m.) Xu, Huang and Che had a discussion, after which Martinsen was shown the lights in the one of the warehouses at Huang Zheng. Xu brought in two lights, which Martinsen recognized as some of the stolen ones. Martinsen was told that if he returned on December 3, 2007, he could see all of the lights and the documents regarding the relevant transactions.

n.) On December 3, 2007, at about 1500 hours Martinsen returned to Huang Zheng with an interpreter. Che told him that Huang had instructed him to show the lights to him, but Martinsen asked for Huang to appear personally. While they waited for Huang, Che said that Huang Zheng had 174 kilograms-worth of AMP lights and that the cost to reclaim them would be over four hundred dollars ($400.00). When Huang arrived, he gave instructions to an employee who uncovered a large laundry cart that was hidden by a lot of old clothes. The cart contained approximately 22 of the stolen lights. When asked if he would return the stolen lights without payment, Huang replied through the interpreter that he would hold the lights pending payment. Martinsen said that he would need to see receipts before any reimbursement could be made, so Huang and Che took him to a building at the front of and on the side of Huang Zheng that is adjacent to Puerto Rico Drive. There Huang and Che showed him numerous documents pertaining to the light purchases, and Martinsen photographed these documents. Che told Martinsen that he would be contacted when the rest of the information was gathered.

5.) On or about December 14, 2007, I reviewed reports provided by the CNMI Department of Commerce ("DOC") to Martinsen. These reports concerned copper and scrap metal transaction reporting forms submitted by Huang Zheng in November 2007. My review of CNMI Public Law 15-36 indicated that reporting by recycling centers of certain information, including the name of any seller of scrap metal, is required by CNMI law. Public Law 15-36 also requires the creation of video recordings of scrap metal transactions and the preservation of those video

recordings for six months following the transactions. The forms and other documents provided by DOC, along with those photographed by Martinsen on December 3, 2007, suggest that the following sales of metal, brass-colored lights consistent with those stolen from AMP took place from November 1, 2007, through November 5, 2007:

  a.) On November 1, 2007, DOC documents, Huang Zheng invoices and accompanying documentation reflect two purchases from Dominic Chptlwelong of brass and a "light body with holder." The seller received a total of approximately one hundred fifty-five dollars ($155.00) in cash for these sales at 8:28 a.m. and 2:38 p.m. The origin of the scrap metal as reported on the scrap metal transaction reports signed by the seller showed "Koblerville" on one form and "his own house" on the other. Xu and Mollah received the scrap metal on behalf of Huang Zheng, and a photocopy of Dominic Chptwelong's CNMI driver license was taken. Dominic Chptwelong is the name of one of the two people accused by Ochcha of making Ochcha sell lights stolen from AMP.

  b.) On November 2, 2007, Huang Zheng documents reflect a sale of brass for sixty dollars ($60.00) that appears to have been signed by Xu, Haung's brother-in-law. The seller's name was not recorded as required; instead, "ABO100" appears in the space designated for the seller's name. "ABO100" is the CNMI tag number registered to Tomaso Chptwelong and is the tag number of the sedan that Martinsen saw speed away from Huang Zheng on November 7, 2007.

  c.) On November 3, 2007, Huang Zheng documents reflect two sales of "brass/light holders" and "BARSS" [sic], for which the sellers received a total of approximately one hundred twenty dollars ($120.00). The receivers, who appear by their signatures to have been Mollah and Xu, completed invoices but apparently not the required DOC report for these transactions. In the space for name on the invoices, "ABO100" was written, consistent with the tag

of a vehicle registered to Tomaso Chptwelong and of the sedan that Martinsen saw speeding away from Huang Zheng on November 7, 2007.

      d.) On November 4, 2007, DOC and Huang Zheng documents reflect a sale of brass for forty-one dollars and twenty-five cents ($41.25) to "Koko." The receiver for Huang Zheng appears by his signature to have been Xu, and "ABO100" is written on the invoice in lieu of the seller's name. However, a photocopy was taken of the seller's passport, the Federated States of Micronesia passport for Joyce C. Nimwes. Handwritten notations appear on the photocopy of this passport: "ABO-100 Toyota RAV-4 Brass" and "Nov. 03, 2007." The signature of the seller appearing on the scrap metal transaction report does not appear to match that on the passport.

      e.) On November 5, 2007, DOC and Huang Zheng documents reflect a sale of a "brass light body" to Mollah at 9:20 a.m. for eighty dollars ($80.00). Instead of the required seller's name, the invoice bears the notation "ABO 100." The scrap metal transaction report for this transaction shows information consistent with the driver license of Dominic Chptwelong, but bears a seller's signature that appears to be different than that on the scrap metal transaction reports involving Dominic Chptwelong on November 1, 2007. The report describes the item sold as "light brass body broken." The origin of the metal item shown on the scrap metal transaction report, which was signed by the seller, is "Garapan," the village in which AMP is located.

  6.) Based on the information set forth above, there is probable cause to believe that evidence, fruits, and/or instrumentalities of violations of Title 18, United States Code, Section 641, which are set forth above, and listed in Attachment B, will be found in the premises described in Attachment A.

/ /

/ /

/ /

WHEREFORE, affiant prays that a search warrant be issued, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search the premises described in Attachment A and to seize those items set forth in Attachment B.

Further Affiant sayeth not.

Dated this December 21, 2007.

Joseph Auther
Special Agent, FBI



Exhibit 1 – B